TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00504-CV






Cox Texas Newspapers, L.P. d/b/a The Smithville Times; Cox Texas Partners, Inc.

d/b/a The Smithville Times; and Tyanna Tyler, Appellants


v.


Charles Penick, Appellee






FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT

NO. 24,252, HONORABLE VANN CULP, JUDGE PRESIDING





O P I N I O N



 Appellants Cox Texas Newspapers, L.P. d/b/a the Smithville Times, Cox Texas
Partners, Inc., d/b/a the Smithville Times, and Tyanna Tyler ("Cox Newspapers" and "Tyler" or,
collectively, "appellants") (1) bring this interlocutory appeal challenging the district court's partial
denial of appellants' motion for summary judgment in a defamation action brought by appellee
Charles Penick. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (West Supp. 2006).

 District Attorney Penick, a public figure, filed suit claiming that he had been defamed
in thirteen publications (including articles, an editorial series, and letters to the editor regarding a
murder trial prosecuted in part by Penick) appearing in the Smithville Times between August 2, 2001,
and January 3, 2002. The district court granted appellants' summary judgment motion regarding
nine of the publications but denied their motion regarding four of the publications, which appeared
on October 18, December 13 and 20, and January 3. (2) On appeal, Cox Newspapers and Tyler assert
that the district court erred in concluding that a genuine issue of material fact remained about
whether these four publications were of a libelous nature because (1) the October 18 editorial was
not "of and concerning" Penick, (2) the December 13 and January 3 articles and the December 20
letter to the editor were substantially true, and (3) Penick failed to present any evidence of actual
malice regarding any of these four publications.

 Because Penick fails to present any evidence to demonstrate that the October 18
article was "of and concerning" him or that any of the disputed publications were published with
actual malice, we will reverse the portion of the district court's order that denied appellants'
summary judgment motion as to these four publications and render a take-nothing judgment in
favor of appellants.






BACKGROUND


 This action arises out a series of articles, editorials, and letters to the editor published
in late 2001 and early 2002 in the Smithville Times regarding the investigation of Stacey Stites's
murder and the subsequent trial of her accused murderer, Rodney Reed. On April 23, 1996, the body
of Stacey Stites, a 19-year-old woman, was discovered partially undressed beside a country road in
Bastrop County. Stites had been sexually assaulted and strangled. Initially, the victim's fiancé,
Jimmy Fennell, Jr., a Giddings police officer, was a suspect, but DNA evidence from semen found
in Stites's body diverted the focus to Rodney Reed. Reed was arrested, tried, and convicted of
capital murder. He was then sentenced to death in 1998. (3) Appellee Charles Penick was the Bastrop
County District Attorney at the time of Reed's trial. Penick enlisted the Attorney General's office
to lead the prosecution. Assistant Attorney General Lisa Tanner was assigned to the case and acted
as chief prosecutor.

 The Smithville Times covered the story of the murder investigation and Reed's trial
from 1996 through 2002. (4) Appellant Tyanna Tyler, a reporter for the Smithville Times, was initially
assigned in 2001 to cover a writ of habeas corpus proceeding in which Reed's attorney asserted that
DNA evidence from saliva found on beer cans near Stites's body had been suppressed during the
trial by the prosecution. Testing of the DNA evidence ruled out Reed as a donor but could not
exclude two police officers who were friends of Fennel, the initial suspect in the murder.

 Thereafter, Tyler continued to research Reed's case. She read the trial record and
investigative files and interviewed Reed, his family, friends, and defense counsel. Tyler also asked
David Fisher--a local citizen who had previously conducted his own independent investigations of
public employees--to look into the "inconsistencies" of the Reed case. Tyler used some of Fisher's
research in her articles.

 Tyler authored a series of ten editorial articles highlighting why "reasonable doubt"
existed in the Reed case and who may have acted inappropriately in their official capacity. The
Smithville Times ran the editorial series from August 2 to October 18, 2001. Eight of the editorials
present a detailed review of the evidence and are void of commentary about the prosecution. Only
the opening and closing editorials, published on August 2 and October 18, contain Tyler's criticism
of the prosecution. In both, Tyler refers expressly to Assistant Attorney General Lisa Tanner. 
Penick is never mentioned in the ten-part editorial series by name or by title.

 In early December 2001, Fisher filed a complaint with the Travis County District
Attorney's Special Prosecution Public Integrity Unit against Penick, Tanner, Attorney General Greg
Abbott, and the Capital Litigation Division of the Attorney General's office. Fisher's complaint
alleged violations of Reed's constitutional rights, prosecutorial misconduct, and a "conspiracy to
commit fraud." The Smithville Times reported Fisher's filing on December 13, 2001, in an
article with the headline "Fraud Charges filed on DA in Reed Case." This article was not part of the
ten-part editorial series, which had concluded on October 18. Although the December 13 article
accurately reported the substance of Fisher's complaint, it is undisputed that this article contained
three errors--namely, that (1) Fisher's complaint had been filed with the Attorney General's office,
(2) Tanner had asserted at trial that she had made every effort to deliver a May 13 lab report to the
defense, and (3) the chief counsel for the court of criminal appeals had advised Fisher to contact the
FBI or Judge Towslee.

 In the next issue published on December 20, 2001, the Smithville Times printed a
letter to the editor written by Fisher titled, "Fisher appologizes [sic] for errors." (5) The letter thanked
the paper for reporting on the charges that he filed against Penick and Tanner and offered corrections
to the three errors contained in the December 13 article. Specifically, Fisher's December 20 letter
stated that "the resulting few errors that need to be restated are my fault":


 First, I filed the complaint with the Travis County District Attorney's Special
Prosecution/Public Integrity Unit, not with the Attorney General's Office.


 Second, it was at the hearing that Lisa Tanner asserted that she made every
effort to deliver the May 13th lab report to the Defense, not at the trial.


 Third, George Wetzel, Counsel of the Court of Criminal Appeals did not advise
me to contact the FBI or Judge Towslee. The FBI asked that I notify Judge Towslee
and [Reed's] attorney of my findings.



 On January 3, 2002, the Smithville Times published a year-in-review article that
highlighted prominent headlines from the year 2001, catalogued by month. Under the "December"
heading, one headline read "Fraud charges filed on D.A. in Reed case by citizen in county." The
headline had been altered from its original publication to include "by citizen in county." Otherwise,
there was no further explanation of the content of the article as originally printed.

 Penick filed suit against Cox Newspapers and Tyler asserting that he had been
defamed by the articles, editorial series, and letters to the editor published in the Smithville Times
between August 2, 2001, and January 3, 2002. Appellants sought both a traditional and a no
evidence summary judgment on all of Penick's claims. See Tex. R. Civ. P. 166a(c), (i). The district
court granted partial summary judgment in appellants' favor on nine of the thirteen disputed
publications but ruled that a genuine issue of material fact remained as to the defamatory character
of the four publications on October 18, December 13 and 20, and January 3.

 Cox Newspapers and Tyler now bring this interlocutory appeal of the district court's
order, urging that the court erred by not granting summary judgment as to these four publications on
the basis that Penick failed to produce any evidence on at least one element of his defamation claims
regarding each publication or, alternatively, because appellants conclusively disproved at least one
element of each of his claims as a matter of law. Specifically, appellants claim that no genuine issue
of fact remains about the defamatory nature of any of the four publications because (1) the October
18 editorial is not "of and concerning" Penick, (2) the December 13 and January 3 articles and the
December 20 letter to the editor and are substantially true, and (3) none of these publications was
published with actual malice.







ANALYSIS


Standard of Review

 When a party seeks both a traditional and a no evidence summary judgment, we
first review the trial court's summary judgment under the no evidence standards of rule 166a(i). 
Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). If the nonmovant failed to produce
more than a scintilla of evidence raising a genuine fact issue on the challenged elements of his
claims, then there is no need to analyze whether the movant's summary judgment proof satisfied the
traditional summary judgment burden of proof under rule 166a(c). Id.

 A no evidence motion for summary judgment must be granted if, after an adequate
time for discovery, (1) the moving party asserts that there is no evidence of one or more essential
elements of a claim or defense on which an adverse party would have the burden of proof at trial,
and (2) the nonmovant fails to produce more than a scintilla of summary judgment evidence raising
a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). In a case where the trial
court's judgment does not specify the grounds relied upon for its ruling, the summary judgment must
be affirmed if any of the theories advanced is meritorious. Carr v. Brasher, 776 S.W.2d 567, 569
(Tex. 1989); Sheshunoff v. Sheshunoff, 172 S.W.3d 686, 692 (Tex. App.--Austin 2005, pet. denied).

 In reviewing a no evidence summary judgment, we "must examine the entire record
in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any
doubts against the motion" to determine whether more than a scintilla of evidence was presented on
the challenged elements of the nonmovant's claim. City of Keller v. Wilson, 168 S.W.3d 802, 825
(Tex. 2005); Perdue v. Patten Corp., 142 S.W.3d 596, 604 (Tex. App.--Austin 2004, no pet.). More
than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded
people to differ in their conclusions. King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751
(Tex. 2003). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no
more than create a mere surmise or suspicion' of a fact." Id. (quoting Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983)). Because the propriety of granting a summary judgment is a
question of law, we review the trial court's decision de novo. Natividad v. Alexsis, Inc., 875 S.W.2d
695, 699 (Tex. 1994). Likewise, summary judgment is reviewed in public figure or public official
defamation cases under the same standard as in other cases. See Huckabee v. Time Warner Entm't
Co., 19 S.W.3d 413, 423 (Tex. 2000) (holding that "we decline to adopt the clear-and-convincing
standard at the summary judgment stage of a public-figure defamation case").

 To prevail in a defamation case, a plaintiff who is a public official or figure must
prove that the defendant (1) published a false statement about the plaintiff, (2) that was defamatory,
(3) while acting with actual malice. Id. at 420; see also Grotti v. Belo Corp., 188 S.W.3d 768, 774
(Tex. App.--Fort Worth 2006, pet. denied).



"Of and Concerning"


 As Penick concedes, to prevail on his defamation claim, he must produce evidence
that the disputed publications were "of and concerning" him. See New York Times v. Sullivan, 376
U.S. 254, 288 (1964); Robert D. Sack, Sack on Defamation § 2.9 (3d ed. 2006). "There must be
evidence showing that the attack was read as specifically directed at the plaintiff." Rosenblatt v.
Baer, 383 U.S. 75, 81 (1966). In other words, the publication "must refer to some ascertained or
ascertainable person and that person must be the plaintiff." Newspapers, Inc. v. Matthews, 339
S.W.2d 890, 893 (Tex. 1960); see also Huckabee, 19 S.W.3d at 429 (documentary film's false
statement regarding "single family court" was not expressly or implicitly directed at plaintiff in
particular, so was not defamatory). Even if the plaintiff is not expressly named, the plaintiff may
satisfy his burden on the "of and concerning" element by offering proof that persons acquainted with
the plaintiff would understand the publication to refer to him. Matthews, 339 S.W.2d at 894; see
also Harvest House Publs. v. The Local Church, 190 S.W.3d 204, 213-14 (Tex. App.--Houston
[1st Dist.] 2006, pet. denied); Eskew v. Plantation Foods, Inc., 905 S.W.2d 461, 462
(Tex. App.--Waco 1995, no writ); Poe v. San Antonio Express-News Corp., 590 S.W.2d 537, 542
(Tex. App.--San Antonio 1979, writ ref'd n.r.e.).

 Here, Penick does not deny that he was never mentioned by name or office in the
October 18 article, nor in any of the other nine editorials authored by Tyler from August 2 to October
18. In relevant part, the October 18 article reads:


 Reasonable doubt exists in this case. In fact, I am of the opinion that the
whole case is flawed from the word go, and that the U.S. Justice Department needs
to launch an investigation. I am aware that the Attorney General's Office has
launched a criminal investigation into this case. I have heard rumors of jury rigging,
evidence tampering, witness intimidation, document fraud, and illegal magistration
[sic] charges, which could prove to be true. I have overheard Judges and Attorneys
make statements like, they "wouldn't touch this case with a ten-foot pole because it
had Towslee's fingerprints all over it," and "it was not something that they even
wanted to think about."


* * * *


 The entire prosecution's case was based on a false premise. A dead body
found in a partial state of undress does not constitute aggravated sexual assault
resulting in murder. Minimal semen cells logically don't support recent or 'fresh'
semen nor do they prove sexual assault. Anytime there is prosecutorial and defensive
evidence sealed during the pre-trial phase obviously there are some problems evident. 
Anytime you have one law enforcement agency keeping evidence from another one,
which supersedes it, you have problems with evidence and the investigation.



 The article then details several actions by various police officers that Tyler felt
demonstrated why the "case is flawed from the word go." For example, the article discusses that the
original suspect's vehicle was not properly inventoried, that crime scene photos went undeveloped
for fifteen months, that DNA testing was never conducted on available samples, and that multiple
police reports were flawed or inconsistent with other evidence. In so doing, the article specifically
names four officers, refers multiple times to "the DPS," and references the medical examiner by title. 
The article then discusses the actual evidence presented in the case, with Tyler's commentary about
various inconsistencies. The article specifically names Judge Towslee, noting problems with the
orders he had entered in the case, and names the "State's Appointed Special Prosecutor, Lisa
Tanner," stating that she "had been brought before the State Bar for prosecutorial misconduct and
allegations about the evidence suppression in this case." The article concludes by characterizing the
Rodney Reed case as one that could become the "case in point" to "fix the problems of the indigent
defense practices in the State of Texas." Although the article criticizes the manner in which the
prosecution was conducted, only the Attorney General's office and Tanner are named in this critique. 
Nowhere in the October 18 article is Penick mentioned, either by name, title, or implication.

 At best, a connection could be drawn between Penick and the October 18 article on
the basis that, as the District Attorney, he was responsible for supervising prosecutions in Bastrop
County. Penick cites Sellards v. Express-News Corporation for support. See 702 S.W.2d 677, 680
(Tex. App.--San Antonio 1985, writ ref'd n.r.e.) ("When a group is named and the plaintiff is a
readily identifiable member of the group, a cause of action for defamation exists if those who know
and are acquainted with the plaintiff understand the article refers to the plaintiff."). In Sellards, a
private citizen sued for defamation when a car crash, in which she was a passenger, was described
by a reporter as a "drug-induced suicide." Id. at 678. The wording of the publication could have
been interpreted as meaning that all passengers of the car were involved in drugs or suicide. Id. at
680. Though the plaintiff was not named as a passenger in the car, those who knew her were aware
that she was a passenger in the car. Id. Thus, the article was "of and concerning" the plaintiff. Id. 

 However, the United States Supreme Court has set a separate standard for public
officials who supervise government agencies. Sullivan, 376 U.S. at 289. An impersonal attack
criticizing the actions of a governmental agency without referring specifically to its agents, without
more, will not support a claim of libel by the head of that agency. Id. (statements criticizing
police operations were insufficient to establish libel against county commissioner who was
responsible for oversight of police department). In Sullivan, the Court held that "the bare fact that
the [county commissioner plaintiff] was in overall charge of the Police Department and, thus, bore
official responsibility for police conduct" was insufficient to support the plaintiff's claim that he had
been personally attacked by an article criticizing police operations. Id. The Sullivan Court
further explained that:


to the extent that some of the witnesses thought the [plaintiff] to have been charged
with ordering or approving the conduct or otherwise being personally involved in it,
they have based this notion not on any statements in the [publication], and not on any
evidence that he had in fact been so involved, but solely on the unsupported
assumption that, because of his official position, he must have been.



Id. at 289 n.28 (emphasis added). Because the statements in Sullivan referred to only the
governmental agency supervised by the plaintiff, without "mak[ing] even an oblique reference to
[plaintiff] as an individual," they were not defamatory as a matter of law. Id. at 289; see also
Huckabee, 19 S.W.3d at 429 (statement that "was [] a criticism of the family courts in general and
not of Judge Huckabee in particular" was not actionable).

 The Supreme Court reaffirmed its Sullivan holding in Rosenblatt v. Baer, stating that
a public figure plaintiff may not prevail in a defamation claim based on an article criticizing "a small
group acting for an organ of government, only some of whom were implicated, but all of whom were
tinged with suspicion." See 383 U.S. at 82. According to the Court, "[a] theory that the column cast
indiscriminate suspicion on the members of the group responsible for the conduct of this
governmental operation is tantamount to a demand for recovery based on libel of government, and
therefore is constitutionally insufficient." Id. at 83.

 The holdings of Sullivan and Rosenblatt were succinctly summarized by the Supreme
Court of Virginia, as follows:


[T]he use of the "small group theory" alone as the basis for satisfying the "of and
concerning" element of a common law defamation action against a governmental
actor does not survive constitutional scrutiny. . . . A member of a governmental
group against which an allegedly defamatory statement is made can sustain a
common law action for defamation only if that member can show the statement
specifically implicated that member or each member of the group. Such implication
can be shown by extrinsic evidence, but evidence that others "understood" the
implication based solely upon a plaintiff's membership in the referenced group will
not satisfy the "of and concerning" requirement.



Dean v. Dearing, 561 S.E.2d 686, 689 (Va. 2002) (citations omitted).

 Although Penick was involved in the prosecution, there is no evidence to show that
readers would associate the article's criticism with him individually. Newspapers, 339 S.W.2d at
289-290; Sellards, 702 S.W.2d at 680. Accordingly, under the standard announced in Sullivan and
Rosenblatt, Penick cannot establish that the October 18 article is "of and concerning" him based
solely on the fact that he supervised those specifically named or because he assumed that his status
as a public figure would cause people to associate him with the article. See Rosenblatt, 383 U.S. at
82-83; Sullivan, 376 U.S. at 289.

 Acknowledging that the October 18 article never mentions him, Penick urges this
Court to look outside the four corners of the article and consider whether a reader would have
associated the article with him based on other publications in the Smithville Times that were not
included in the ten-part editorial series--namely, an August 23 letter to the editor written by Fisher
and a September 20 article written by editor Metta Johnson. (6) Penick cites Buck v. Savage, 323
S.W.2d 363 (Tex. App.--Houston 1959, writ denied), and Gibler v. Houston Post Co., 310 S.W.2d
377 (Tex. App.--Houston 1958, writ denied), in support. Both Buck and Gibler involved articles
that made reference to an individual who, by the "circumstances" in the article, might be readily
identified. See Buck, 323 S.W.2d at 376-77; Gibler, 310 S.W.2d at 385. Penick uses these cases to
support quite a different assertion--that one article referencing a governmental group may be
deemed "of and concerning" an unidentified member of the group if that individual's name has been
used in past articles appearing in the same periodical.

 Penick has cited no authority for this theory. Examining all related publications is
an accepted practice when evaluating the issue of actual malice because it can illuminate a personal
vendetta of the defendant, which demonstrates the defendant's state of mind at the time of
publication. Freedom Newspapers of Tex. v. Cantu, 168 S.W.3d 847, 858 (Tex. 2005). However,
applying the same technique to determine whether a particular publication is "of and concerning"
the plaintiff--when the focus remains on whether the specific publication is defamatory at all--is
novel. Rather, the Supreme Court has established that the specific publication cannot be "of and
concerning" the plaintiff if it does not "make even an oblique reference to [the plaintiff] as an
individual." Sullivan, 376 U.S. at 289. 

 Although we recognize that defamation claims should be reviewed in context, our
concern is where the inquiry would stop under Penick's analysis. Penick is a public figure who is
likely to be mentioned frequently by the media. The rule cannot be that a newspaper's individual
reference to a public figure in an article published months earlier could be used to transform a
subsequent article, which never mentions the public figure, into one that is "of and concerning" him. (7) 
Rather, the test requires us to determine whether a person would understand the individual
publication at issue to implicate Penick. See Newspapers, 339 S.W.2d at 289-290.

 Here, the October 18 article does not make even an oblique reference to Penick, either
as an individual or in his capacity as the District Attorney. See Sullivan, 376 U.S. at 289.
Accordingly, Penick has failed to produce any evidence to demonstrate that the October 18 article
was "of and concerning" him. The district court, therefore, erred in denying appellants' summary
judgment motion as to this article. We sustain appellants' first issue.

 With regard to the remaining publications--the December 13 and January 3 articles
and the December 20 letter to the editor--we turn to appellants' third issue because the lack of
evidence of actual malice is dispositive.


Actual Malice


 The Texas Supreme Court has articulated standards for analyzing the existence of
actual malice in public figure defamation cases against media defendants. See, e.g., Cantu, 168
S.W.3d at 849 (media defendants entitled to summary judgment on public figure's defamation claim
because no evidence of actual malice); Hearst Corp. v. Skeen, 159 S.W.3d 633, 639 (Tex. 2005)
(same); New Times, Inc. v. Isaacks, 146 S.W.3d 144, 168 (Tex. 2004) (same); Huckabee, 19 S.W.3d
at 417 (same). To establish defamation, a public figure plaintiff carries the burden to prove that the
defendant published the statements with actual malice. Skeen, 159 S.W.3d at 637 n.1; Huckabee,
19 S.W.3d at 420. The purpose of requiring public figures to overcome this high burden is to protect
uninhibited debate on public issues. Isaacks, 146 S.W.3d at 161-62, 165. 

 At the summary judgment stage, the media defendant can negate that it acted with
actual malice, as a matter of law, by proving that it did not publish the articles at issue with
knowledge of falsity or a reckless disregard for the truth. Cantu, 168 S.W.3d at 853; Huckabee, 19
S.W.3d at 420. Actual malice has been described as "calculated falsehood." Isaacks, 146 S.W.3d
at 162. Whereas "knowledge of falsity is a relatively clear standard, [] reckless disregard is . . . a
subjective standard" that, to be disproved, requires evidence that the media defendant did not
entertain any serious doubts about the truth of the article at the time it was published. Skeen,
159 S.W.3d at 637.

 The defendant can establish such proof through the submission of affidavits, so long
as they are "clear, positive, and direct, otherwise credible and free from contradictions and
inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c); Isaacks, 146
S.W.3d at 163-64. "In actual malice cases, such affidavits must establish the defendant's belief in
the challenged statements' truth and provide a plausible basis for this belief." Huckabee, 19 S.W.3d
at 424. Such affidavits will not be deemed "conclusory" if they "provide [a] detailed explanation
of the affiants' state of mind and descriptions of the steps taken to ensure that the article [was not
published with knowledge of falsity or with a reckless disregard for the truth]." See Isaacks,
146 S.W.3d at 165. 

 Once the defendant produces some evidence that it did not act with actual malice, the
burden shifts to the plaintiff to produce evidence of the contrary. Cantu, 168 S.W.3d at 853;
Huckabee, 19 S.W.3d at 420. At this stage, we assume all facts favorable to the nonmovant are true
and draw all reasonable inferences in its favor. Huckabee, 19 S.W.3d at 424. If the plaintiff fails
to produce a scintilla of evidence to create a genuine issue of material fact about the existence of
actual malice, then summary judgment is appropriate, pursuant to either a traditional or no-evidence
analysis. See Tex. R. Civ. P. 166a(c), (i). (8)

 Here, the appellants supported their motions for summary judgment with affidavits
from Tyler, the author of the articles in question, and from Metta Johnson, the managing editor of
the Smithville Times at the time of the disputed publications. Tyler averred that, in preparation for
the series, she researched the police reports, medical examiner's report, trial transcripts, appeals,
investigative reports of the Texas Rangers, and press articles from other publications. She also
interviewed Reed's family, friends, attorneys, and private investigators. Tyler acknowledged that
she solicited Fisher's viewpoint on the Reed case and stated that she trusted him based on his prior
success investigating public officials. Tyler further averred that she had no contempt for Penick and,
in fact, never mentioned Penick's name in her editorial series. Tyler stated in her affidavit that she
believed all the facts represented in her articles to be true at the time of publication and, with the
exception of the few non-material facts that Fisher corrected in his December 20 letter to the editor,
she still believes them to be true.

 Johnson's affidavit expresses that she believed the Reed case was an important news
event in Bastrop County. According to her affidavit, Johnson assigned Tyler to report on a habeas
corpus hearing in March 2001, but Tyler continued researching the Reed case on her own initiative. 
After Tyler explained to Johnson many of the inconsistencies that Tyler saw in the case and the
reasons for her opinions, Johnson agreed that an editorial series would be appropriate because these
inconsistencies "had not gotten much coverage during the Reed trial." Johnson averred that she did
not have any animosity toward Penick and that, in her opinion, Penick was excluded from the
editorial series because he was not relevant to the inconsistencies discovered by Tyler. Johnson
further averred that, as editor, she published letters to the editor on both sides of the issue. (9) 
Additionally, Johnson's affidavit noted that the errors contained in Tyler's December 13 article were
corrected by publishing Fisher's December 20 letter to the editor. Johnson believes that the editorial
series expressed "honest opinions" about the Reed case and that the December 13 article "accurately
recount[ed]" Fisher's allegations concerning Penick.

 In their respective affidavits, both Tyler and Johnson aver that they believed the
reports to be accurate at the time of publication, explain what their state of mind was at the time, and
provide descriptions of why they had a reasonable belief in the truth of the articles. Isaacks, 146
S.W.3d at 165; Huckabee, 19 S.W.3d at 424. These affidavits satisfy appellants' initial burden on
negating actual malice as a matter of law in order to shift the burden to Penick to present evidence
establishing a genuine issue of material fact about the existence of actual malice in this case. Cantu,
168 S.W.3d at 853.

 Penick raises seven points that he believes support his assertion of actual malice: the
appellants (1) failed to tell the reader that Travis County was not investigating Fisher's letter, (2)
printed dubious information from a biased source, (3) hid from the reader the relationship between
the Smithville Times and Fisher, (4) omitted complimentary statements about Penick from a
candidate's campaign announcement published in the Smithville Times, (5) predicted future
publications and events, (6) failed to talk to Penick, Tanner, or other members of the prosecution
team, and (7) omitted and juxtaposed facts to create an overall false impression. We will
address each in turn.


 Failure to tell readers that Travis County was not investigating Fisher's letter

 Penick claims that, by not clarifying in the December 13 article, which was headlined
"Fraud charges filed on DA in Reed case," that the Travis County District Attorney's office had not
opened an "active investigation," the appellants published the article with actual malice. In support
of this argument, Penick relies on the fact that Mary Farrington from the Public Integrity Unit of the
Travis County District Attorney's office had informed the Smithville Times on November 14 or 15
that complaints similar to Fisher's were received frequently and that, at that time, no active
investigation had been opened on the allegations filed by Fisher against Penick. Penick asserts that
the truth of the December 13 article was grossly distorted by the omission of Farrington's November
statement that no active investigation had been opened. We disagree.

 A media defendant's "omission of facts may be actionable if it so distorts the
[readers'] perception that they receive a substantially false impression of the event." Huckabee, 19
S.W.3d at 425. For a public figure to demonstrate that such an omission constitutes actual malice,
however, he must present evidence that the defendant was aware that the omission could create a
substantially false impression. Id. at 426 (plaintiff could satisfy test with evidence that defendant
selectively omitted facts to purposefully create false portrayal of events). If the omission of certain
facts does not grossly distort the story, then the defendant's "failure to capture accurately all the
story's details suggests [only] an error in judgment, which is no evidence of actual malice." Id. 

 Penick presented no evidence that appellants were or should have been aware that the
omission of Farrington's November comment from the December 13 article would create a
substantially false impression of the relevant events. After Farrington spoke with the newspaper in
November, Fisher amended his complaint on December 7, and the newspaper never received an
updated report from Farrington about the status of the investigation following Fisher's amended
filing. In the December 13 article, appellants reported that Fisher had filed the allegations (both the
original and amended ones), without discussion as to whether the Public Integrity Unit was actively
investigating them or not. Penick does not dispute the truth of the article's report that Fisher "filed
a formal complaint" charging Penick and others with "conspiracy to commit fraud . . . in connection
with the Rodney Reed case," and Penick acknowledges that, at the time of publication, these charges
were still pending.

 Moreover, Farrington swore in her deposition that she informed the newspaper only
that "we [do] not have an open investigation at this time and [] we receive[] complaints all the time
from lots of different people." (10) She did not tell the newspaper that the complaint was baseless or
frivolous, nor did she say that an investigation would never be opened. Indeed, in her deposition
Farrington clarified that, "[the office] receives complaints from lots of different people, and we take
those complaints, and we, of course, review them." Thus, appellants could have reasonably inferred
at the time of publication that Fisher's complaint was still in some preliminary review stage,
especially taking into account that Fisher had recently amended the complaint. The presumption that
the investigation was still open at some level was substantially true because Farrington did not
consider the matter closed until December 18 when she sent a letter stating such to Fisher.

 The truth of the December 13 report (that Fisher had filed allegations against Penick)
was not grossly distorted by appellants' omission of the fact that the pending complaint had not yet
been actively investigated by the Travis County Public Integrity Unit. The omission of Farrington's
November statement is not evidence of actual malice. See Huckabee, 19 S.W.3d at 425-26.


 Publication of dubious information from a biased source


 Next, Penick claims that actual malice is demonstrated by the fact that appellants
printed "dubious information" obtained from a "biased source"--i.e., Fisher. Yet, Penick offers no
evidence to support this claim. Evidence that a media defendant's "report was mistaken, even if
negligently so, is no evidence of actual malice" unless the plaintiff presents evidence that the
defendant purposefully published mistaken facts or that the circumstances were "so improbable that
only a reckless publisher would have made the mistake." Cantu, 168 S.W.3d at 855. "An
understandable misinterpretation of ambiguous facts does not show actual malice." Id. As long as
the article presents a "rational interpretation" of the actual events, the article standing alone will not
establish actual malice. Id. at 857. Likewise, a media defendant's failure to fully investigate does
not constitute actual malice, although its purposeful avoidance of the truth does. Skeen, 159 S.W.3d
at 637. In addition, evidence that an article was written "from a particular point of view, even when
[the article is] hard-hitting or sensationalistic, is no evidence of actual malice." Huckabee,
19 S.W.3d at 425.

 Penick fails to present evidence that appellants acted recklessly or purposefully
avoided the truth in relying on Fisher as a source. Penick relies primarily on a statement by Davis
McAuley, editor of The Bastrop Advertiser, that he believed Fisher was untrustworthy. Even
assuming that someone else regarded Fisher as an outlandish conspiracy theorist, evidence of another
person's opinion, who has no connection to the instant case, is not evidence (1) that Fisher was so
untrustworthy that it would be reckless for anyone to believe him or (2) that appellants were aware
of Fisher's lack of trustworthiness and chose to ignore it or purposefully avoided the truth. Thus,
it is not evidence of actual malice on behalf of appellants. See St. Amant v. Thompson, 390 U.S. 727,
733 (1968) (although defendant reported some mistaken information provided by source, failure to
investigate source's credibility was not evidence of reckless publication; record failed to demonstrate
"a low community assessment of [source's] trustworthiness"); Beck v. Lone Star Broad. Co.,
970 S.W.2d 610, 617 (Tex. App.--Tyler 1998, pet. denied) ("failure of a defendant to fully
investigate . . . the credibility of a source does constitute actual malice").

 Similarly, even assuming the publications were authored from a hard-hitting
conspiracy theorist's perspective, this too provides no evidence of actual malice. See Huckabee,
19 S.W.3d at 425; New Times, Inc. v. Wamstad, 106 S.W.3d 916, 928 (Tex. App.--Dallas 2003,
pet. denied) ("reporter may rely on statements by a single source, even though they reflect only one
side of the story, without manifesting a reckless disregard for the truth"). Evidence of Fisher's prior
investigations into other alleged conspiracies is also not evidence that Fisher provided unreliable
information to appellants concerning the Reed case or that appellants were aware the information
was unreliable. There is simply no evidence in this record that would allow a reasonable fact-finder
to conclude that, in using Fisher as a source, appellants acted with actual malice, whether
consciously or recklessly.

 Finally, it is not disputed that Tyler did not blindly rely on Fisher's investigation. 
According to Tyler's and Johnson's deposition testimony, they concluded that, based on their review
of the trial evidence, reasonable doubt existed about Reed's guilt. Fisher's deposition reflects that
he formed the same conclusion from his independent investigation. While Tyler and Johnson could
have done more investigating, there is no evidence that they "purposefully avoided the truth" and
no evidence that only a reckless publisher would have published the information they reported. See
Skeen, 159 S.W.3d at 637 (reporter's five months of research, including interviews and reading court
records, coupled with absence of source that could have easily disproved statements showed no
purposeful avoidance of the truth to constitute actual malice in reporter's criticisms of district
attorney's office); see also Cantu, 168 S.W.3d at 855. 


 Failure to disclose relationship between the Smithville Times and Fisher

 In support of his claim of actual malice, Penick argues that the Smithville Times hid
the fact that Tyler asked Fisher to investigate the case in order to use Fisher's independent
assessment as corroboration for Tyler's own theories. This argument is without merit for two
reasons. First, Penick has failed to demonstrate that appellants "hid" this relationship from the
readers. To the contrary, the newspaper published Fisher's August 23 letter to the editor stating that
he had been asked by a reporter to investigate the Reed case. (11) Second, even taking as true Penick's
claim that appellants "hid" the fact that Fisher aided in the investigation, this is no evidence of actual
malice because journalists are not required to reveal every source of information upon which they
have relied. Turner v. KTRK Television, Inc., 38 S.W.3d 103, 123 (Tex. 2000). Because appellants'
use of Fisher as a source was not reckless, regardless of whether this relationship was revealed or
kept confidential, it does not demonstrate that the articles were published with knowledge of falsity
or a reckless disregard for the truth. 

 These facts are akin to the ones found in Turner. Id. There, the media defendant
failed to reveal that one of its sources for a news story, which implicated a mayoral candidate in a
possible insurance fraud scandal, was a member of the opposing campaign. There was evidence that
the defendant knew of the source's affiliation. Id. However, the court ruled that the defendant's
failure to reveal its source was not clear and convincing evidence of actual malice because (1) the
plaintiff failed to produce sufficient evidence that the media defendant intended to endorse the
opposing candidate, and (2) the defendant may have believed in the truth of the story. Id. Similarly,
Penick's claim that appellants "hid" the fact that Fisher was a source provides no evidence that
appellants had serious concerns about the veracity of the publication. (12)


 Omission of complimentary statements about Penick 


 Penick argues that actual malice is demonstrated by the fact that, on September 13,
2001, when the Smithville Times reported that Bryan Goertz had announced his candidacy for
District Attorney, appellants failed to include complimentary statements made in Goertz's campaign
announcement about Penick. We disagree.

 The September 13 story is solely about Goertz's candidacy: his background,
qualifications, and reasons for seeking office. The only mention of Penick in the article is that "[t]he
position is currently being held by veteran prosecutor Charles Penick, who previously announced
that after 25 years in office, he will not be seeking re-election." Penick does not allege that any
information in this statement is false and/or that it was damaging to his character or reputation. The
newspaper had discretion to edit its story to cover only the relevant facts about the current candidate
and to omit the candidate's favorable statements about the incumbent. Such an omission by
appellants provides no evidence of actual malice toward Penick. See Turner, 38 S.W.3d at 122-23
(Tex. 2000) (journalist entitled to edit story as necessary, and omission of favorable comments about
plaintiff, when remainder of report is not otherwise false, is not evidence of actual malice); HBO
v. Harrison, 983 S.W.2d 31, 42 (Tex. App.--Houston [14th Dist.] 1998, no pet.) (quoting
Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 258 (1974)) (editorial choice to exclude
favorable comments about public figure in otherwise truthful report is not actual malice).

 Moreover, appellants had previously published favorable statements about Penick. 
On August 16, Johnson authored a report about Penick's decision to not seek re-election, which
included Penick's quote that, "I have enjoyed the 24 years I have spent representing the people of
Bastrop County; however, it is now time to move on to new endeavors. I am proud of the work my
professional staff has accomplished. I want to thank all of the voters and friends that have supported
me in past elections and wish only the best to my successor."

 A news organization cannot be required to print or air the viewpoint of everyone who
might speak on a public figure's behalf. Turner, 38 S.W.3d at 122. Also, there is no evidence that
the omission of these favorable statements grossly distorted the articles at issue or created a
substantially false impression of Penick. See Huckabee, 19 S.W.3d at 425-26 (because omission of
facts that more clearly explained plaintiff's judicial decisions did not grossly distort story, it was not
evidence of actual malice). Hence, appellants' omission of Goertz's favorable statements about
Penick provides no evidence of actual malice. See Cantu, 168 S.W.3d at 858.


 Prediction of future publications and events

 Penick's fifth argument for actual malice is based on his claim that the Smithville
Times had predetermined to publish the December 13 article headlined "Fraud charges filed on DA"
article, regardless of whether the story turned out to be true or false, because Tyler had previously
stated in an October 18 editorial that the Attorney General's office had launched an investigation. 
Like Penick's first actual malice argument, this claim hinges on whether the allegations filed by
Fisher were being "actively investigated." In other words, Penick asserts that actual malice is
demonstrated because Tyler reported that an investigation had been launched before actually finding
out whether Fisher's allegations of fraud would be investigated.

 Penick cites Harte-Hanks Communications, Inc. v. Connaughton as support. 
491 U.S. 657, 684 (1989). In Harte-Hanks, a newspaper editorial predicted the discovery of
information damaging the integrity of candidates for municipal judge before publishing allegations
about one of the candidates a few days later. Id. Subsequent interviews all contradicted the
allegations, yet the newspaper chose to publish the allegations as predicted. Id. at 683. The
United States Supreme Court held that this demonstrated a reckless disregard for the truth. Id.
at 684. Penick argues that, like the defendants in Harte-Hanks, appellants acted with actual
malice by publishing the December 13 article based on a predetermined decision regardless of
the article's truth.

 However, Penick cannot show that the primary contents of the December 13 article
were false. Other than the three misstated errors, which were minor and were corrected by Fisher's
December 20 letter to the editor, the December 13 article accurately reported that the allegations had
been filed by Fisher and were pending. Thus, this provides no evidence of actual malice. See
Grotti, 188 S.W.3d at 775 ("to prove substantial truth, the defendants need only prove that the
third party allegations were in fact made and accurately reported and that the allegations were
under investigation").






 Failure to talk to Penick, Tanner, or other prosecutorial members

 Penick argues that the Smithville Times and Tyler acted with actual malice because
they intentionally avoided the truth by failing to interview Penick and others on the prosecution side
of the Reed case. Although the failure of a newspaper to fully investigate allegations before
publishing them will not alone support a finding of actual malice, purposeful avoidance of the truth
will. Harte-Hanks, 491 U.S. at 692. Evidence of a media defendant's knowledge that a public figure
plaintiff has denied harmful allegations or offered an alternative explanation of events is not
evidence that the defendant doubted the allegations for purposes of establishing actual malice,
because "[i]n the world of politics, 'such denials are so commonplace [that] . . . they hardly alert the
conscientious reporter to the likelihood of error.'" Cantu, 168 S.W.3d at 858; see also Harte-Hanks,
491 U.S. at 692 n.37; Skeen, 158 S.W.3d at 639; Hucakbee, 19 S.W.3d at 427. Also, a news
organization is not required to publish the interviews of everyone who might speak on a public
figure's behalf. See Turner, 38 S.W.3d at 122. While a media defendant may purposefully avoid
the truth by failing to investigate obviously crucial and reliable sources of information, the law is
clear that the public figures themselves need not be interviewed due to their personal bias and the
likelihood of a denial. See Harte-Hanks, 491 U.S. at 692 n.37; Cantu, 168 S.W.3d at 858; Skeen,
158 S.W.3d at 639; Huckabee, 19 S.W.3d at 427. 

 As support for his position, Penick cites Bentley v. Bunton, 94 S.W.3d at 602. In
Bentley, the court ruled that the defendant had displayed actual malice by hounding a public figure
relentlessly for months with ruthless corruption accusations on television, while privately expressing
doubts about the charges, and by "deliberately ignor[ing] people who could have answered all his
questions." Id. The instant case is distinguishable, however, because the defendant in Bentley went
beyond the mere failure to consult with the plaintiff or investigate other sources; he broadcast severe
accusations about which he had privately expressed serious doubt. Id. Thus, in Bentley, the
defendant's actions fell squarely within the definition of "reckless disregard" because the defendant
had expressed doubt for the veracity of his defamatory claims and had ignored obvious and unbiased
sources of information as a means of purposefully avoiding the truth. Id. at 590, 602.

 In the case at hand, Tyler expressed no such doubt about the veracity of her
accusations. Tyler interviewed defense attorneys and investigators to determine what practices or
procedures in the Reed case were inconsistent with a proper investigation. She researched the public
record on the Reed case. She viewed crime scene reports, pictures, and videotapes reflecting the
views of the law enforcement officers involved in the original investigation. She read the trial and
hearing transcripts displaying the arguments and theories of the prosecution. Although Tyler did not
seek the comments of those she accused of prosecuting a flawed case against an innocent man, she
was not required to do so. See El Paso Times v. Trexler, 447 S.W.2d 403, 406 (Tex. 1969) (even
"[negligence] or failure to act as a reasonably prudent man [in investigating a story] is [] insufficient"
to establish actual malice); Cloud v. McKinney, No. 03-04-00656-CV, 2006 Tex. App. LEXIS 7658,
at *28-29) (Tex. App.--Austin Aug. 30, 2006, no pet.) (opinion) (Spokeswoman's failure "to check
[facts] with McKinney or Cloud prior to making the statements does not mean that [spokeswoman]
made the statement knowing that it was false or with reckless disregard as to the truth or the
statement."). The fact that Tyler had done enough research to have a reasonable belief in her
viewpoint is sufficient to disprove a reckless disregard for the truth. Trexler, 447 S.W.3d at 406; see
also Fort Worth Star-Tele. v. Street, 61 S.W.3d 704, 713 (Tex. App.--Fort Worth 2001, pet. denied). 

 Tyler's actions are also unlike the defendant's actions in Harte-Hanks, which the
Supreme Court deemed to involve actual malice. See 491 U.S. at 692. There, the Court held that
the defendant purposefully avoided the truth by publishing accusations against a mayoral candidate
when the defendant was aware of tape-recordings by other witnesses that clearly showed the
accusations to be false. The Court held that the defendant's choice to ignore the tapes was likely "a
product of a deliberate decision not to acquire knowledge of facts that might confirm the probable
falsity of [the grand juror's] charges." Id. Penick presented no evidence that Tyler had received
significant information contrary to her theories or that there was some clear way she may have
verified the truth of her claims.

 Penick produced no evidence showing that Tyler doubted the veracity of her claims,
as did the defendant in Bentley, 94 S.W.3d at 590, 602, or that Tyler purposefully avoided the truth,
as did the defendant in Harte-Hanks, 491 U.S. at 692. Thus, Tyler's failure to interview Penick and
other prosecutors is not evidence of actual malice.


 Modification of facts to create a false impression


 In his final actual malice argument, Penick alleges that the "gist" of the defamatory
articles as a whole conveyed a false impression to the readers, which he argues was "so glaring as
to serve as proof of malice." See Turner, 38 S.W.3d at 116; see also Huckabee, 19 S.W.3d at 426. 
As support, Penick lists several facts that he claims were either improperly omitted from or
juxtaposed within appellants' publications. However, whether or not the "gist" of the articles could
be proven to be false, actual malice requires evidence that appellants knew of or recklessly
disregarded the false impression created by the articles. See Huckabee, 19 S.W.3d at 426.

 Penick cites Huckabee v. Time Warner Entertainment as support for the idea that
"glaring" falsehoods are stand-alone evidence of actual malice. Id. Huckabee provided a single
example of a case where the omission of facts may be stand-alone evidence of actual malice. Id. at
426 (citing Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1092 (3rd Cir. 1988)). In Schiavone,
the Third Circuit ruled that a newspaper's omission of exculpatory statements from a story reporting
about an FBI memorandum that linked the plaintiff to the disappearance of Jimmy Hoffa was
evidence of actual malice because four unbiased FBI sources corroborated the statements to the
newspaper before publication, and the omission so changed the character of the story that the
defendant likely knew or suspected that it would convey a false impression. Schiavone Constr.,
847 F.2d at 1092.

 Although the court in Huckabee acknowledged that in some cases an omission of fact
could be proof of actual malice, it did not go so far as to say that all omissions of fact would serve
as evidence of actual malice. Huckabee, 19 S.W.3d at 426. In fact, the court in Huckabee held that
the defendant's omission of facts, which would have made the plaintiff's judicial decisions appear
less arbitrary, was not evidence of actual malice without additional evidence that the defendant
omitted the facts with knowledge that it may convey a substantially false impression. Id. Huckabee 
set the bar high to protect a media defendant's choice of what material to include in its broadcasts. 
"Although the facts omitted might or might not have led a reasonable viewer to suspend judgment
or even to reach an opposite conclusion regarding [the plaintiff], their omission did not grossly
distort the story" and, thus, was not stand-alone proof of actual malice. Id. Here, there is no
evidence that appellants knew or should have known that their choice of published facts would
convey a substantially false impression or grossly distort the truth of the story to a reasonable reader.

 In his seven arguments, Penick fails as a matter of law to raise a genuine issue of
material fact regarding actual malice. 


CONCLUSION


 The district court erred by denying the appellants' motion for summary judgment
regarding the October 18 article because the article was not "of and concerning" Penick. 
Furthermore, the district court erred by denying the appellants' motion regarding the October 18,
December 13 and 20, and January 3 articles because Penick failed to present a scintilla of evidence
to demonstrate that any of these articles was published with actual malice.

 Accordingly, we reverse the portion of the district court's order that denied summary
judgment for the appellants regarding these four articles, and we render a take-nothing judgment in
favor of appellants on Penick's claims related to these four articles.



 

 W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Reversed and Rendered

Filed: February 13, 2007
1. The Smithville Times is owned by Cox Texas Newspapers, L.P.
2. Summary judgment was granted as to one article published on August 2 because Penick
failed to file suit on this article within the one-year statute of limitations. See Tex. Civ. Prac. &
Rem. Code Ann. § 16.002 (West 2002). Summary judgment was granted on eight of the remaining
editorials and letters to the editor because there was not sufficient evidence to raise a genuine issue
of material fact on any of the elements essential to maintain a defamation action by a public figure. 
See Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 423 (Tex. 2000) (setting forth elements). 


 Interlocutory appeal of the portion of the order granting appellants' summary judgment
motion is not permitted by section 51.014(a)(6). Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6)
(West Supp. 2006). Our review is therefore limited to whether summary judgment was appropriately
denied on Penick's claims related to the October 18 editorial, the December 13 and January 3
articles, and the December 20 letter to the editor.
3. Reed continues to appeal the verdict. His application for writ of habeas corpus is currently
pending before the Texas Court of Criminal Appeals. Ex parte Reed, Cause No. WR-50, 961-03.
4. Many other local and state publications reported the story, including the developing
allegations of official misconduct. These included the Bastrop Advertiser, the Austin American-Statesman, the Austin Chronicle, Texas Monthly, and others.
5. Fisher had first written a letter to the editor published on August 23, 2001, in which he
acknowledged that "a reporter" had requested that he look into the Reed case and presented the
readers with some of his findings about inconsistencies in the evidence presented at Reed's trial. 
In this letter, Fisher also commented on Penick's decision not to seek reelection. The letter was
titled "Reader asks DA Penick, 'Which is it?'"
6. As support for the "of and concerning" element, Penick also points to the subsequently-published December 13 and January 3 "Fraud Charges Filed on D.A." article and headline. Even
if we were to consider other publications in determining whether the October 18 article was "of and
concerning" Penick, we could not include the December and January articles in such a review
because they had not been published at the time of the October 18 article. 
7. Although not controlling, we find Early v. Toledo Blade, 720 N.E.2d 107
(Ohio Ct. App. 1998), instructive because of its factual similarities to this case. There, the Toledo
Blade ran a multi-part editorial series investigating the internal affairs of the local police department. 
Id. at 113-14. Several police officers sued for defamation, and the trial court granted summary
judgment in favor of the Toledo Blade. Id. at 114. The appellate court held that statements about
"drug and alcohol abuse by public servants, misplaced values, and the corruption of our systems, . . .
alcohol cases where officers were carrying guns, . . . [and] neglect of duty cases" were not actionable
because they were "not 'of and concerning' any one individual." Id. at 121-22. Further, regarding
one particular plaintiff, the court held that a subsequent publication several days later specifically
naming that plaintiff did not turn the prior article into one "of and concerning" that plaintiff. Id. at
122. Moreover, regarding each of the defamation plaintiffs, the appellate court considered the
multiple publications collectively to determine whether they were of a defamatory character and
published with actual malice, but declined to consider them collectively in determining whether any
article in particular was of and concerning the plaintiffs. See generally id. at 123-35.
8. Although the United States Supreme Court has ruled that the clear and convincing standard
of proof is required for actual malice in summary judgment cases under Federal Rule of Civil
Procedure 56, see Anderson v. Liberty Lobby, Inc., 477 U.S .242, 255-57 (1986), the Texas Supreme
Court has not adopted this view for summary judgment proceedings under Texas Rule of Civil
Procedure 166a, see Freedom Newspapers of Tex. v. Cantu, 168 S.W.3d 847, 859 n.49 (Tex. 2005).
9. This is confirmed by the record, which includes letters to the editor appearing in the
Smithville Times on September 20 and October 25 criticizing Tyler's editorial series and espousing
views that Reed is guilty beyond a reasonable doubt.
10. The wording of Farrington's phone call is not disputed. Both parties rely upon
Farrington's recollection of her words in her deposition.
11. See supra footnote 5.
12. We recognize that Turner involved a clear and convincing standard that is higher than the
level of evidence required in the case at hand, but we find the analysis persuasive.